# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued November 15, 2010       Decided March 4, 2011

No. 10-5057

AMERICAN BAR ASSOCIATION,
APPELLEE

v.

FEDERAL TRADE COMMISSION,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 1:09-cv-01636)

*Michael D. Bergman*, Attorney, Federal Trade Commission, argued the cause for appellant. With him on the briefs were *Willard K. Tom*, General Counsel, and *John F. Daly*, Deputy General Counsel for Litigation.

*Mark D. Harris* argued the cause for appellee. With him on the brief was *James F. Segroves*.

*Jack R. Bierig* was on the brief for *amici curiae* American Medical Association, et al. in support of appellee.

*Matthew M. Wright* was on the brief for *amici curiae* State and Local Bar Associations in support of appellee.

*Daniel E. Loeb* was on the brief for *amicus curiae* American Institute of Certified Public Accountants in support of appellee.

Before: ROGERS and GRIFFITH, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*:

The Fair and Accurate Credit Transactions Act of 2003 ("FACT Act"), Pub. L. No. 108-159, 117 Stat. 1952, amended the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.*, and authorized the Federal Trade Commission ("FTC" or "Commission") to promulgate regulations requiring financial institutions and creditors to establish internal procedures to prevent identity theft. In November 2007, following notice-and-comment rulemaking, the FTC adopted Identity Theft Rules (the "Red Flags Rule" or "Rule"), 16 C.F.R. § 681 *et seq.*, requiring financial institutions and creditors to implement and maintain programs to protect consumers from identity theft. *Id.* § 681.1. The Red Flags Rule incorporated, without amplification, the FACT Act's definitions of "credit" and "creditor." *See id.* § 681.1(b)(4) & (5). Neither the Rule nor the statute indicated whether lawyers or law firms were covered.

In April 2009, in response to some public confusion over the Rule's coverage, the FTC issued an Extended Enforcement Policy, explaining that "professionals, such as lawyers or health care providers, who bill their clients after services are rendered," would be considered "creditors" under the statute and, therefore, subject to the Rule's requirements. FTC, *FTC Extended Enforcement Policy: Identity Theft Red Flags Rule, 16 CFR 681.1* ("Extended Enforcement Policy" or "Policy") at 1 n.3 (Apr. 30, 2009), *reprinted in* Joint Appendix ("J.A.") 76. In

August 2009, appellee American Bar Association ("ABA") filed suit in the District Court challenging the Commission's Extended Enforcement Policy. The ABA claimed that the Commission had "intruded upon an area of traditional state regulation," Compl. ¶ 57 (Aug. 27, 2009), *reprinted in* J.A. 22-23, and that the Policy was unlawful absent "a clear statement from Congress" authorizing federal regulation over the practice of law, *id.* ¶ 41, J.A. 19. The District Court agreed with the ABA and enjoined the FTC from enforcing the Red Flags Rule against lawyers. *ABA v. FTC*, 671 F. Supp. 2d 64 (D.D.C. 2009). The FTC appealed to this court.

Oral arguments were heard by this court on November 15, 2010. Shortly thereafter, Congress passed the Red Flag Program Clarification Act of 2010 ("Clarification Act"), Pub. L. No. 111-319, 124 Stat. 3457 (to be codified at 15 U.S.C. § 1681m(e)(4)). On December 18, 2010, the President signed the act into law. The Clarification Act expressly amended the FACT Act, changed the definition of "creditor," and made it clear that a creditor's allowance of deferred payments alone could not trigger the identity theft protection requirements.

The enactment of the Clarification Act moots this case. It is well established that a case must be dismissed as moot if new legislation addressing the matter in dispute is enacted while the case is still pending. *See, e.g.*, *Dep't of Treasury v. Galioto*, 477 U.S. 556, 559-60 (1986) (holding that when intervening legislation "alters the posture" of a pending case, "it is the duty of the appellate court" to vacate the judgment of the district court and dismiss the case as moot) (quotation omitted); *Clarke v. United States*, 915 F.2d 699 (D.C. Cir. 1990) (en banc) (same). In its current posture, this case concerns: (1) the enforcement of statutory provisions in the FACT Act that have been amended; and (2) a complaint that challenges an agency policy statement that purports to interpret a rule that was promulgated before the statute was amended. Because the new

legislation has clearly altered the posture of the case, there is no longer a live "case or controversy" before this court. Accordingly, we are constrained to vacate the District Court's judgment and opinion, and remand the case to the District Court with directions to dismiss the case as moot.

## I. Background

Congress enacted the FACT Act to "prevent identity theft, improve resolution of consumer disputes, improve the accuracy of consumer records, [and] make improvements in the use of, and consumer access to, credit information." Pub. L. No. 108-159, 117 Stat. 1952, 1952. As noted above, the FACT Act amended the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.*, and, among other things, authorized the FTC to "prescribe regulations requiring each financial institution and each creditor to establish reasonable policies and procedures" to prevent identity theft. 15 U.S.C. § 1681m(e)(1)(B). Acting pursuant to its delegated authority under the FACT Act, the FTC conducted notice-and-comment rulemaking proceedings, which resulted in the agency's promulgation of the Red Flags Rule. Identity Theft Red Flags and Address Discrepancies Under the Fair and Accurate Credit Transactions Act of 2003, 72 Fed. Reg. 63,718 (Nov. 9, 2007) (codified at 16 C.F.R. § 681 *et seq.*). The Red Flags Rule did not address whether lawyers or law firms were covered by the statute or the Rule.

The FTC initially set November 1, 2008, as the deadline for compliance with the Red Flags Rule. This deadline was extended to May 1, 2009, due to uncertainty regarding the Rule's coverage. Press Release, FTC, *FTC Will Grant Six-Month Delay of Enforcement of 'Red Flags' Rule Requiring Creditors and Financial Institutions to Have Identity Theft Prevention Programs* (Oct. 22, 2008), *reprinted in* J.A. 70-71. In April 2009, the FTC issued the Extended Enforcement Policy to explain the Rule's coverage and delayed the compliance deadline to August 1, 2009. Extended Enforcement Policy, J.A.

76-78. The Extended Enforcement Policy stated that, in the agency's view, the term "creditor," as used in the Red Flags Rule and the FACT Act, included "all entities that regularly permit deferred payments for goods or services," including professionals "such as lawyers or health care providers, who bill their clients after services are rendered." *Id.* at 1 n.3, J.A. 76. This amplification of the statute and the Rule was never the subject of notice-and-comment rulemaking.

The ABA filed a three-count complaint against the FTC in the District Court, seeking injunctive and declaratory relief against the Commission. In Count I, the ABA alleged that the Extended Enforcement Policy was unlawful under the "clear statement doctrine," because "the regulation of the practice of law is traditionally the province of the [S]tates" unless Congress grants the agency regulatory authority through clear and unambiguous statutory language. *See* Compl. ¶¶ 55-59, J.A. 22-23 (alteration in original) (quoting *ABA v. FTC*, 430 F.3d 457, 471 (D.C. Cir. 2005)). Count II sought an injunction on the grounds that the FTC's action was arbitrary and capricious. Count III sought a declaratory judgment. The ABA moved for summary judgment on Count I, urging the trial court to "set aside the Extended Enforcement Policy to the extent the FTC purports to apply the Red Flags Rule to lawyers engaged in the practice of law, as well as any other application of the Red Flags Rule to lawyers engaged in the practice of law." *Id.* ¶ 60, J.A. 23.

The District Court granted the ABA's motion for summary judgment. *ABA v. FTC*, 671 F. Supp. 2d 64 (D.D.C. 2009). Following the ABA's voluntary dismissal of Counts II and III, the District Court issued a final judgment enjoining the Commission from enforcing the Red Flags Rule "against lawyers engaged in the practice of law." Judgment at 1, J.A. 218. The District Court found that,

[g]iven the plain-meaning and statutorily assigned definitions of the terms interpreted by the Commission, the aim of the legislation, and the ill-adapted application of these terms to the legal profession, it becomes clear that the intent of Congress is unambiguous: it did not grant to the Commission the broad authority to exercise regulatory control over attorneys pursuant to the FACT Act, and accordingly the Red Flags Rule similarly cannot be properly promulgated in such a broad manner.

*ABA*, 671 F. Supp. 2d at 82. The District Court further noted that, even if the statutory language were ambiguous, the agency's broad interpretation of "creditor" as including any lawyer who bills clients on a monthly basis would be unreasonable, "and therefore not 'entitled to respect' because it lacks the 'power to persuade.'" *Id.* at 83 (footnote omitted) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

The FTC appealed the judgment of the District Court, and oral arguments were heard by this court on November 15, 2010. On November 30, 2010, the United States Senate passed the Red Flag Program Clarification Act, S. 3987, 111th Cong. (2010), to amend section 1681m(e)(4) of the FACT Act. 156 CONG. REC. S8289 (daily ed. Nov. 30, 2010). The same bill was passed by voice vote in the House of Representatives on December 7, 2010. 156 CONG. REC. H8060 (daily ed. Dec. 7, 2010). On December 18, 2010, the legislation was signed into law by the President. Clarification Act, Pub. L. No. 111-319, 124 Stat. 3457 (2010).

## II. Analysis

### A. *The ABA's Claims Have Been Rendered Moot by the Clarification Act*

The mootness doctrine, deriving from Article III, limits federal courts to deciding actual, ongoing controversies. Even where litigation poses a live

> controversy when filed, the doctrine requires a federal court to refrain from deciding it if events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future.

*Clarke*, 915 F.2d at 700-01 (quotations omitted). In this case, the intervening event that ended the ongoing controversy between the ABA and the FTC was Congress' enactment of the Clarification Act. The portions of the Commission's Extended Enforcement Policy that were the subject of the ABA's complaint have been effectively vitiated by the Clarification Act. The ABA's claims were thus rendered moot by the intervening legislation. *See, e.g.*, *Galioto*, 477 U.S. 556 (dismissing challenge to statute denying access to firearms based on prior mental institutionalization as moot due to intervening redraft of statute providing an administrative remedy for those affected); *Nat'l Black Police Ass'n v. Dist. of Columbia*, 108 F.3d 346 (D.C. Cir. 1997) (finding challenge to voter initiative capping campaign contribution levels moot due to subsequent legislation raising the caps above the voter initiative levels); *Defenders of Wildlife, Inc. v. Endangered Species Scientific Auth.*, 725 F.2d 726 (D.C. Cir. 1984) (holding that congressional amendments to Endangered Species Act mooted challenge to guidelines issued under the previous version of the statute).

There can be no confusion here that the Clarification Act served to moot the ABA's claims in this case. The new legislation is clearly aimed at the precise matter in dispute.

Before the enactment of the new legislation, a "creditor" under the FACT Act was defined as

> any person who regularly extends, renews, or continues credit; any person who regularly arranges for the extension, renewal, or continuation of credit; or any

assignee of an original creditor who participates in the decision to extend, renew, or continue credit,

15 U.S.C. § 1691a(e), and credit was defined as

the right granted by a creditor to a debtor to defer payment of debt or to incur debts and defer its payment or to purchase property or services and defer payment therefor.

*Id.* § 1691a(d). These provisions were materially altered by the Red Flag Program Clarification Act.

Under the Clarification Act, a "creditor" is now defined as follows:

(4) DEFINITIONS.–As used in this subsection, the term 'creditor'–

(A) means a creditor, as defined in section 702 of the Equal Credit Opportunity Act (15 U.S.C. 1691a), that regularly and in the ordinary course of business–

(i) obtains or uses consumer reports, directly or indirectly, in connection with a credit transaction;

(ii) furnishes information to consumer reporting agencies, as described in section 623, in connection with a credit transaction; or

(iii) advances funds to or on behalf of a person, based on an obligation of the person to repay the funds or repayable from specific property pledged by or on behalf of the person;

(B) does not include a creditor described in subparagraph (A)(iii) that advances funds on behalf of a person for expenses incidental to a service provided by the creditor to that person; and

(C) includes any other type of creditor, as defined in that section 702, as the agency described in paragraph (1) having authority over that creditor may determine appropriate by rule promulgated by that agency, based on a determination that such creditor offers or maintains accounts that are subject to a reasonably foreseeable risk of identity theft.

Pub. L. No. 111-319, § 2(a), 124 Stat. at 3457 (internal quotation marks omitted). The Clarification Act thus clarifies that, to be a "creditor" subject to the Red Flags Rule requirements, one must not only regularly extend, renew, or continue credit under § 1691a(e), but must also "regularly and in the ordinary course of business," (i) obtain or use consumer reports, (ii) furnish information to consumer reporting agencies, or (iii) advance funds with an obligation of future repayment. *Id.*

Most importantly, at least with respect to the matters in dispute in this case, the Clarification Act makes it plain that the granting of a right to "purchase property or services and defer payment therefore" is no longer enough to make a person or firm subject to the FTC's Red Flags Rule – there must now be an explicit advancement of *funds*. In other words, the FTC's assertion that the term "creditor," as used in the Red Flags Rule and the FACT Act, includes "all entities that regularly permit deferred payments for goods or services," including professionals "such as lawyers or health care providers, who bill their clients after services are rendered," Extended Enforcement Policy at 1 n.3, J.A. 76, is no longer viable.

The legislative history of the new Clarification Act also confirms Congress' intention to bar the regulation of lawyers based solely on deferred billing practices. Representative John Adler, who introduced the legislation in the House, stated that "[w]hen I think of the word 'creditor,' dentists, accounting firms, and law firms do not come to mind . . . . It is clear when Congress wrote the [FACT Act], they never contemplated including these types of businesses within the broad scope of that law." 156 CONG. REC. H8059 (daily ed. Dec. 7, 2010) (statement of Rep. Adler). *See also* 156 CONG. REC. S8289 (daily ed. Nov. 30, 2010) (statement of Sen. Dodd) ("The legislation also makes clear that lawyers, doctors, . . . an[d] other service providers will no longer be classified as 'creditors' for the purposes of the red flags rule just because they do not receive payment in full from their clients at the time they provide their services, when they don't offer or maintain accounts that pose a reasonably foreseeable risk of identity theft.") (commenting as chairman of the Senate Banking Committee regarding "what the Red Flag Program Clarification Act of 2010 will accomplish").

The parties' supplemental briefs to this court trade arguments as to whether attorneys might be subject to regulation by the FTC under the amended statute. But this question was not raised in the ABA's complaint, nor could it have been. The complaint focused on the FTC's Extended Enforcement Policy, which purported to amplify a rule that was promulgated pursuant to a statute that has since been amended. In these circumstances, there is no "live" case or controversy before this court. Why? Because the policy, rule, and statute that gave rise to this suit are no longer in the same posture.

It does not matter that the FTC might hereafter pursue notice-and-comment rulemaking to promulgate *new* rules pursuant to which the agency may seek to regulate lawyers and law firms. Nor does it matter that the agency may pursue a *new*

enforcement policy against lawyers and law firms. These are merely hypothetical possibilities – indeed, the parties may even view them as likely possibilities. But they are nothing more than *possibilities* regarding regulations and enforcement policies that do not presently exist. This is not enough to give rise to a live dispute. "The mootness doctrine, deriving from Article III, limits federal courts to deciding actual, ongoing controversies." *Clarke*, 915 F.2d at 700-01 (quotation omitted). The case now before the court is moot.

**B.      *No Exceptions to Mootness Are Present in This Case***

The only remaining question is whether there are any exceptions to mootness that are applicable to this case.

> There are two [principal] exceptions to mootness. The first pertains to situations in which "the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration," yet there is a "demonstrated probability that the same controversy will recur involving the same complaining party." *Murphy v. Hunt*, 455 U.S. 478, 482 (1982) (per curiam).

> . . . .

> The second exception involves a party's "voluntary cessation" of the challenged activity. As a general rule, a defendant's "voluntary cessation of allegedly illegal conduct does not deprive [a court] of power to hear and determine the case." *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979). Voluntary cessation will only moot a case if "there is no reasonable expectation . . . that the alleged violation will recur" and "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Id*. The defendant carries the burden of demonstrating "that there is no reasonable expectation

that the wrong will be repeated," and "[t]he burden is a heavy one." *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953).

HARRY T. EDWARDS & LINDA A. ELLIOTT, FEDERAL STANDARDS OF REVIEW – REVIEW OF DISTRICT COURT DECISIONS AND AGENCY ACTIONS 114-15 (2007) (second and third alterations in original). Neither exception applies in this case.

This case does not fall within the "capable of repetition, yet evading review" exception, *Murphy v. Hunt*, 455 U.S. 478, 482 (1982) (per curiam), because recurrence of the challenged activity will not "evade review" should the parties' dispute recur. Even if the Commission were to adopt a revised regulatory scheme under the amended statute that purports to regulate attorneys, the new regulation will be subject to judicial review *at that time*. As we noted in *National Wildlife Federation v. Hodel*, 839 F.2d 694 (D.C. Cir. 1988), any new "regulations [will be] in no danger of expiring before judicial review is complete[, and i]t would be entirely inappropriate for this court to . . . issue an advisory opinion to guide the [agency's] rulemaking." *Id.* at 742 (refusing to find the Secretary of the Interior's withdrawal of a challenged regulation to be an exception to mootness).

Likewise, the "voluntary cessation" exception to mootness has no play in this case. The FTC's abandonment of the Extended Enforcement Policy was not voluntary. The agency most assuredly did not alter its definition of "creditor" in order to avoid litigation. Rather, intervening legislation simply nullified the FTC's policy statement that all lawyers who bill their clients after services are rendered are covered by the Red Flags Rule and the FACT Act. This scenario is not within the compass of the voluntary cessation exception to mootness. *Cf. Campbell v. Clinton*, 203 F.3d 19, 34 n.14 (D.C. Cir. 2000) ("The President's cessation of the attack on Yugoslavia was not

'voluntary' within the [Supreme] Court's [mootness doctrine] meaning; the war ended because the United States won, not because the President sought to avoid litigation.").

In sum, this case is moot due to the enactment of intervening legislation. And no exceptions to mootness are present in this case.

### C.    *Vacatur of the District Court's Decision*

In *United States v. Munsingwear, Inc.*, 340 U.S. 36, 40 (1950), the Supreme Court noted that vacatur is normally appropriate once a case is determined to be moot, because it "clears the path for future relitigation of the issues between the parties and eliminates a judgment, review of which was prevented through happenstance." Thus, in a matter such as this, in which intervening legislation "alters the posture" of a pending case, the Court has held that "it is the duty of the appellate court" to vacate the judgment of the district court and dismiss the case as moot. *Galioto*, 477 U.S. at 559-60.

The Supreme Court later clarified that vacatur is an equitable matter and not automatic in all situations in which a pending case is rendered moot. *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 23-25 (1994). *Bancorp* indicates that vacatur is usually inappropriate when "the party seeking relief from the judgment below caused the mootness by voluntary action." *Id*. at 24. The *Bancorp* presumption is inapposite here because the FTC – the party who would get relief from the judgment below – did nothing to render this case moot. The case is moot because of the congressional enactment of the new Clarification Act.

Furthermore, we have held that the *Bancorp* presumption rarely applies in situations when, as here, a case is rendered moot by intervening legislation.

> Clearly, the passage of new legislation represents voluntary action, and thus on its face the *Bancorp* presumption might seem to govern. We believe, however, that application of the *Bancorp* presumption in this context is not required by the *Bancorp* opinion's rationale and would be inappropriate, at least if there is no evidence indicating that the legislation was enacted in order to overturn an unfavorable precedent. The rationale underlying the *Bancorp* presumption is that litigants should not be able to manipulate the judicial system by rolling the dice in the district court and then washing away any unfavorable outcome through use of settlement and vacatur. The mere fact that a legislature has enacted legislation that moots an appeal, without more, provides no grounds for assuming that the legislature was motivated by such a manipulative purpose. The legislature may act out of reasons totally independent of the pending lawsuit, or because the lawsuit has convinced it that the existing law is flawed. In *American Library Association v. Barr*, 956 F.2d 1178 (D.C. Cir. 1992), we rejected the argument that vacatur was not appropriate where a case had become moot on appeal due to Congress' passage of new legislation, arguing that Congress' action "to repair what may have been a constitutionally defective statute . . . represents responsible lawmaking, not manipulation of the judicial process." *Id*. at 1187.
>
> . . . .
>
> The presumption of integrity that attaches to legislative action and the difficulties that separation of powers creates for attributing one branch's actions to another

support not applying the *Bancorp* rule to situations where the party seeking vacatur is the government and mootness results on appeal because of legislative action. In this context, absent additional evidence of an illegitimate motive, we believe the general rule in favor of vacatur still applies.

*Nat'l Black Police Ass'n*, 108 F.3d at 351-52, 354 (citations, quotations, ellipsis, and brackets omitted).

*National Black Police Ass'n* directly controls the disposition of this case on the matter of vacatur. We therefore adhere to the law of the circuit in our decision to vacate the judgment of the District Court.

### III. Conclusion

The judgment and opinion of the District Court is hereby vacated. The case is remanded to the District Court with instructions to dismiss the case as moot.